First case for argument this morning is 13-1324, Tyco Healthcare v. Ethicon. Mr. Cavanaugh, whenever you're ready. May it please the Court, Bill Cavanaugh on behalf of Appellant Ethicon Endo-Surgery. The District Court's decision below reflects two fundamental errors of patent law. The first is that having found that Ethicon had demonstrated a 102G prior invention and applying that to anticipate under 102 the independent claims, the Court then refused to use that 102G invention in its obviousness analysis, importing a publication requirement which does not appear anywhere in the statute. Well, was it really a publication requirement or didn't you say that he had to have known, that Tyco had to have known about it? Whether the requirement is known to Tyco or a publication requirement, neither obligation exists under 102G. This Court's decision in Kimberly-Clark deals with the issue of known to the inventor and in DuPont this Court dealt with the known in the art. Can we just for a moment leave the cases aside? I know the briefs cover it and we talk about Clemens and Kimberly-Clark and so forth and there's a bit of a dispute, but leaving all that aside and just turning to the policy questions. Isn't there an argument to be made that even though under 102G you can't have secret prior art, you can't have concealment at least, that that's still something different than what we otherwise think of as something being in the prior art? That there's still some daylight between concealment and prior art even if concealment, the requirement that there be no concealment takes it out of the secret prior art. to have some sort of known requirement either to the art or to the patentee, it could have put that in the statute. It did not. But we're dealing with 103 here. We're talking about whether or not this was prior art under 103. And once it is established that it is a 102G prior invention, it is prior art and there's no basis upon which to say, well, it should anticipate the claims, but it shouldn't be used in an obviousness analysis because it is prior art. That's the point of 102G and there's no basis to somehow create some distinction based upon either the way you demonstrate 102G. Let's go back to the concealment criteria. Is there a difference in your mind between, let's say, active concealment and passive concealment? For purposes of the statute, no, Your Honor, but certainly here there's no evidence of any active concealment on the part of Ethicon. But I don't think you can even go to that level because you would not satisfy 102G if there was an abandonment, a suppression, or a concealment. And here there's no evidence of any of that as the trial court found. So you have a straight out proof of a 102G prior invention. And once that statutory requirement has been satisfied, it is prior art and should be treated as prior art for all purposes. So what led the district court judge astray here? Just the language in In re Clemens? I believe that's true, Your Honor, because certainly Tyco didn't even argue below that there's a known in the art or known to the patentee requirement. What they conceded in their conclusions of law is basically if it's 102G, it's appropriate prior art for obviousness purposes. I think it was the language in Clemens, which is dicta, because in Clemens the court found that the art which they were attempting to argue was 102G. There was no reduction to practice. But as to another piece of art they found, and as to Claim 6, they did found that there had been a reduction to practice and they invalidated that claim. So when you look at the holding of Clemens, it's clear that their discussion of secret prior art is clearly dicta because it had no bearing on the ultimate decision as to the two underlying pieces of prior art that were at issue in that case. And then following that in Kimberly-Clark, they dealt with the issue of does it have to be known to the patentee, and they said no. And then in DuPont, they said, look, there's nothing in the statute that says that it has to be known to the art. Does it make any difference that your prior art wasn't reduced to practice until after the inserted patent? I don't believe so, Your Honor, because think of the concept. You could have a reduction to practice before, and it could still be, quote-unquote, secret. Or you could have the second path, which the district court found. I don't think that really bears on it. I think 102G provides two clear paths. We demonstrated to the satisfaction of the district court that second path. We think we satisfied both paths if you look at the February 1997 test that was done and compare it to what Tyco argued was their reduction to practice on a one millimeter. They said it's OK. And then they had subsequent issues with respect to their— What is the evidence of diligence in the reduction to practice? Throughout that period, we have weekly reports. We have tests being done. They point to a gap, they say, from September of 96 to February of 97. Basically, from September to November is, I would say, irrelevant. But if you look at the appendix sites in our brief, you'll see and look at a critical period, let's say November of 96 to February of 97. They say there's a gap. Their gap is there's no weekly reports. But there is in the record evidence at A13875 of a December test on tissue. In November of 96, we have the engineering drawing and the creation of this prototype. In January, we have tool testing and bench testing. And then on February 6, Dr. Amaral does his videotaped test with a goat. So throughout and then from there on, you have weekly reports and ongoing diligence in an effort to develop a fully commercialized product. There was resulting ultimately in the fall of 97, a constructive reduction to practice, and then ultimately an actual reduction to practice with a commercialized product in early 1998. So even if we agree with you on whether or not the prototype type was prior art, you've still got the questions about the combination with Davis and with the European patent right with regard to dual patent. Actually, Your Honor, what happens is once you treat the EPCON prototype as prior art, the obviousness analysis changes fundamentally because the district court, in its opinion, didn't treat it as a prior invention and therefore started with Davidson. Davidson doesn't have a tube-in-tube construction, doesn't have the ability to rotate. You still concluded that Davidson taught away with regard to the curved blade, right? No. Yes. What the district court did was take an – well, first they said, well, because the curved blade isn't the preferred embodiment, it teaches away. That's contrary to this panel's – this court's law. There's no criticism. As a matter of fact, the concept of the curved blade is in the section entitled Best Mode for the Invention. But if you start with the EPCON prototype as the closest piece of prior art, which it clearly is because it has all the elements, you start from a fundamentally different place. And the district court could not have said, as it did, that EPCON is seeking to take art from many disparate fields. Here, you would start with the EPCON prototype, which has all the elements, save the curved blade. So is it your view that we should decide this here, or don't we need to send it back if she decided it's the wrong place and let her have a do-over with regard to the combination? Your Honor, we submit that on the face of those two pieces of prior art, this court can find these claims obvious. And let me explain why. When you start with the EPCON prototype, you have all the elements. It's the closest piece of prior art. What you're lacking is a curved blade. You don't have to go now to a disparate field to find the concept of a curved blade. It's right there in the next closest piece of prior art, Davison. It teaches it. Now, the district court, in attempting to distance Davison, made a number of errors. First, it said, well, because it's not the preferred embodiment, it teaches away. That's just clearly wrong. It then applied a different application of its claim construction to infringement and invalidity. When it came to infringement, we saw the limitation that it only covered the claims of the Tycho patents, only covered curved blades that were downward and outward. Tycho said, no, it's broad. It can be anything. Any deviation from the longitudinal axis. Can you address the obviousness of the dual-cam claims? Certainly. Again, once you start with the EPCON prototype, you have a single cam. You make a basic – you want to enlarge the size of the blade, and blade size is not an element of the claim. They just went to two cams. They went from one to two. So that's fundamentally different than the district court's approach, because it didn't consider the EPCON prototype as prior art. It started with Davison, which doesn't have a cam, and then went to our EP662 prior reference, which is a surgical staple. Now, we would disagree with the district court's efforts to distinguish EP662 because it's not an energy-based device. Energy has nothing to do with the teaching of 662. What's the motivation to combine the prototypes with the EP662? Well, you wouldn't even have to. But EP662 does teach a dual-cam mechanism in terms of an opening and closing of a jaw for any type of surgical mechanical instrument. But you don't even need to go there, Your Honor, because we would submit it is obvious to simply go from one cam to two. Now, their experts said, well, yes, that would be the obvious – if once you consider the EPCON prototype as a prior art reference, yes, it would be obvious to go from one – to take it from the bottom. You're going to enlarge the blade. So you don't think you need a reference for the dual-cam limitation? Well, you have the EPCON prototype. But does it have a dual-cam? No, it has – That's what I'm asking, Your Honor. Yes, I don't believe you do. A person that's skilled in the art would just necessarily go from EPCON to a dual-cam. As our expert explained, there's some simple mechanical choices here. If we disagree with you on that and have to get to the EPP, do we have to send that back to a determination of whether there's a motivation to combine? I would ask the Court just read the summary of invention in EP662. It says basically, look, we're giving you a jaw structure and a simple mechanical means to open and close this device. And it can be used – and then it gives about eight different examples of the types of surgical instruments that are out there that this can be used on. So as their expert said, yes, it would be obvious to go from one to two once you deal with the EPCON prototype. He said, well, you might not get a good result. But here, we know we got a good result because you got a functional, commercialized product. So their expert's opinion doesn't have any basis in the record. As I said, I think this Court can deal with the obviousness issue as it did KSR and in other cases, and it doesn't need to be sent back. Can you comment on the damages issue? Yes, Your Honor. We think the Court made – there was no basis in this record for an 8 percent royalty based upon – Where did the 8 percent come from? It's hard to tell. Wasn't it an average between the two licenses? Well, no. It was based upon the license numbers put out by both sides. But one, it was based on an entire market value rule approach. Yeah, but you're a little hard-pressed to come up here and complain about the entire market value rule when your expert also relied on the entire market. But, Your Honor, we don't bear that burden. And we moved for JMOL on that point that they couldn't rely on it. Yes, our expert did, but they bear the burden of proof on that point. And here, what they did was they took a bunch of features and they threw them up on the wall, taking the risk that the district court might say, well, you know, most of those are invalidated and are in the prior art. They never sought to show the distinct value, the incremental value, as this court has noted in Lucent and in subsequent cases, that what we're really trying to do in this case is let's figure out what's the incremental value of a curved blade and of a dual cam. And the district court said, well, you know, it may be driving some consumer demand. No evidence of that as to dual cams. And what the district court ended up relying on, because their expert didn't do it, they said, well, there's this Masonics 5% license. And because you're competitors, we're going to jump it up to 8%. The problem with that approach, Your Honor, is that Masonics is on the entire body of the claim. And it didn't deal with the fact that the only thing that's valid here is a claim that has a curved blade. And so, again, the court started with a fundamental problem, which is it started out with looking at licenses covering the entire spectrum of the device, when here what the district court needed to do and didn't have the record to do it was determine what the incremental value is. Thank you. Well, we've exhausted your time. We'll restore four minutes for rebuttal, and we'll add four minutes to the other side's time just to keep things even. Thank you. Your Honors, Drew Wintering, who may have pleased the court, on behalf of Tyco Healthcare Group, LP, and U.S. Surgical Corporation. I'll refer to Tyco and U.S. Surgical as Tyco. I want to address some of the things that were raised just now. First, on the 102. You lose on the prototype issue, then. Am I correct that we don't have to consider anything else, maybe make obviousness of our needs at that? Absolutely not, Your Honor. And I was about to say, you know, whether or not Ethicon is right about the prototype properly being considered prior art or not is not fatal to our case. Because, indeed, the court considered the prototype in finding non-obviousness of the dual cam and curved plate claims, and I was just about to get into that. But on the 102G103 issue, it wasn't just that the court said, well, it's not prior art because it wasn't published, as Ethicon is trying to say. Indeed, the court specifically said that it went to whether or not there was a reduction of practice. When it talked about whether the prototypes were relevant prior art, it said, furthermore, as discussed above, Ethicon is not proved by clear and convincing evidence of prior reduction of practice, and, therefore, the prototypes cannot be considered prior art for obviousness purposes. That's what they said. So we don't even need the publication requirement. Is it your position that there has to be reduction of practice in order for there to be a 102 finding? Yes, it is. What's your authority on that? In Kimberly-Clark, the court specifically stated, quote, that its positive issue in Clemens, as here, was whether there had been a prior reduction to practice. That's at page 1444. After saying that, Kimberly-Clark considered the work of two inventors, Champagne and Mobley. For Champagne, it said Champagne has proved a prior reduction of practice, so that can be considered prior art. For Mobley, there was no prior reduction of practice, so it was not considered prior art. That's the authority for that. Let's assume we reject that. Then you say your argument is you're still left with the good obviousness case with regard to the combination. Absolutely. First of all, even if you can consider the prototype as prior art, with respect to the dual CAM claims, the court specifically considered that argument and rejected Ethicon's position that eventual modification of the prototypes would, to incorporate those dual CAMs, would have caused… Is that the instance where she said the difference, the energy dictated the… Oh, no, no, not at all. On this issue, Dr. Simino specifically testified, that's their expert, specifically testified two things. That modifying the prototypes, which they say was not considered by the court, which had a single tab design which wasn't working to incorporate dual CAMs, is an insignificant change. That's at A2966, A2969. The only other, and it was just a general comment, the only other thing that Dr. Simino testified to was that there were a limited number of types of clamping mechanisms, being camming mechanisms, rod linkage mechanisms, and gear rack mechanisms, that would make the dual CAM an obvious design choice to add to the prototypes. Thus, based on a small, finite number of mechanisms available, it would be an obvious choice. But that doesn't go to the actual structure and variations of structure was needed. In fact, Ethicon's own R&D documents and employee testimony contradicted Dr. Simino's opinion. Because in July 1997, when they went from the single tab design that didn't work to dual CAM, they considered over 40 different clamp redesign ideas. Moreover, and more importantly, in response to Dr. Simino, Dr. Durfee testified at length about why the dual CAM was not obvious. He says, you know, it may be obvious to try, but that in and of itself does not teach how to actually achieve an effective mechanism. He says, it doesn't teach how to achieve an effective dual CAM clamping mechanism in a five millimeter device due in part to the presence of the vibration rod that runs down the middle. He talked about the difficulty of getting the CAMs to operate where there had to be a balance of strength and clamp force. He talked about the complexity of getting each of the CAM mechanisms to equally share the load on and on and on. So what happened here was simply the court credited Dr. Durfee's testimony over Mr. Simino's testimony, found out that it was far from insignificant to go from the single tab of the prototypes to the dual CAM. And weighing these facts is in the province of district court and should be given great deference. In fact, he further went through the fact that they were having all these difficulties and said that's further evidence that it wasn't obvious to go to a dual CAM. In fact, if they were having all these problems for two years and they say it's so obvious to go to a dual CAM as a solution, why did it take two years to implement? So there was evidence on the record specifically addressing whether the dual CAMs were obvious in view of the prototypes, notwithstanding their suggestion that it wasn't considered by court. Given what we've said in our cases, how can you justify the district court here having relied on the entire market value? Okay, that's an excellent question. The district court, reading the opinion, started with lost profits. There's a section entitled entire market value. If you look at what the district court was relying upon as a royalty base, indeed it was the instrument itself. Now the instrument itself has a sole and unitary function. That sole and unitary function is to cut and coagulate tissue. Nothing more. There are no other features of this instrument. That's what it does. What about the trocar? The trocar is a piece, separable piece. I know what it is, but isn't there a patent on the trocar? Isn't there a what? A patent on the trocar? The trocar is not at issue in this case. The trocar is not part of the royalty base. No, but I thought you were getting ready to argue that this instrument is not a multi-panet device. No, it has a singular function. That's the point I'm trying to make right now. And that function of clamping and sealing tissue is performed by what? It's performed by the blade and the clamp. The very features that are at issue here. They perform that function. What she said was the patented features are physically connected and part of the accused devices. And that was her rationale for invoking the entire market value rule. As a matter of law, is that a correct statement? In the end, it doesn't matter because she rejected the lost profits analysis. And when you get to the royalty analysis, what she basically was dealing with was the instrument itself. And I want to make a couple points about what the instrument was. The instrument requires a generator to provide power. In fact, some of the claims include generator. Tyco did not include generator in the royalty base. The instrument includes a transducer. The transducer provides the ultrasonic vibration. That's actually incorporated into the instrument. But it's sold separately by Ethicon. And that was not included in the royalty base. The only thing in the royalty base is this instrument that has a single function to clamp, cut, and seal. And that's performed by the very patented features we're talking about. So when you come down to it, this is the small saleable patent practicing unit. No question. And more important, there was no evidence whatsoever provided by either party, frankly, that there's any way to further separate out the features that they mentioned. So this is similar to laser dynamics where if you use the ODD, that would be the small saleable patent practicing unit. The mistake was to go to the full software. I'm sorry, the full computer. Now, we could have gone to something larger. We didn't. We went to the very smallest piece. So in essence, whatever you called it, what the judge applied the rationale to was a small saleable patent practicing unit. And that's what their expert applied. And that's what our expert applied it to. And in those circumstances, don't you still need to apportion for the value of the patent? It's a very good question. So counsel talked about Lucent. But what Lucent says is you can do that apportionment of value when you have that by applying the Georgia Pacific factors. And that's exactly what the court did here. What happened was, and it reflects market reality and reasonableness, because if you look at the license agreements that were available to the court and available to both experts, they focus on the instrument. So they do the very same thing. And what the court did here specifically was take the Georgia Pacific factors, which includes 9 and 10, which go to the value of the patented feature, and also 11, which goes to the value of the patented feature to Ethicon. And the court factored out of that. When the experts had their review of the facts and came up with their opinions, their expert says, you know what? Top, it's going to be 5%. Our expert says, on the lower end, it's going to be 12%. The court found it was 8% and did exactly what Lucent said to do. The court said specifically, were it not for the corresponding invalidity at the specific aspects of the patented devices, such as rotation and ability to fit down a 5-millimeter trocar, this factor may have driven the rate up. It took out those features. However, the court will only consider the role of the curved blade technology and added power of the dual-cam design, which are features that may have played a role in demand for the accused products, but would not be sole considerations between the parties at the hypothetical stage. The court's already factored out what's been taken out of the case. The court goes on to say that Ethicon has the benefit of the Davison patent and the immune products, which were devices that existed that have a straight blade, otherwise similar, and it factored out those when it came up with the 8%. It says, quote, further, the 8% rate takes into account the fact that Ethicon had its own ultrasonic technology in the form of the dated Davison 055 patent and the immune products, yet also accounts for the fact that Ethicon's accused products, which contained the patent features, were far more successful than its immune product, where the only difference was straight versus curved blade. So the apportionment's been done to the extent any further apportionment might be required, and it follows the teaching of Lucent to do so. So, again, this is not like a computer where you have various apps and various features, all of which have some value, but it's certainly not the value of the computer. Here you have the cam mechanism that closes down against the blade to secure the tissue. That is what performs the function. It's a singular function. Was there any evidence that the cam feature, for example, drove the sales of the entire product, drove demand for the accused products? I'm not sure. Did you ask if there is evidence? Yes. Was there evidence? Yes. That the patent features drove consumer demand? Yes. And with respect to the curved blades, that is summarized in our briefs at 54 to 55 because it's very extensive, but I'll just give you a couple of examples. We have the word of Ethicon's own documents. It's not experts. Ethicon's training documents reveal that the introduction of curved blades, quote, meet market demand for curved shears. Ethicon's documents first say there was clearly an unmet need that was being met with the curve, and it goes on and on and on. And Ethicon's curved blade replaced, they had an immune product. It was immune from soot because of a settlement agreement. None of that shows that the curved blade drove market demand. Well, these are all quotes of surgeons that Ethicon relies upon in its marketing materials. These are quotes of surgeons saying, you know, that's going to meet the market demand. Clearly there's an unmet need. And also the testimony of Karim Kardar, who is Ethicon's former global director, is saying there was clearly an unmet need that was being met by the curve. So under laser dynamics, we laid out a clear test as to when a pen feature drives consumer demand. I'd like for you to show how you met that test. Okay. One thing to kind of step, take a step sideways from that, is my understanding of laser dynamics also established that one way to, and a proper way to assess the reasonable royalty, is through using as a base the smallest patent-practicing unit, sellable-practicing unit. Okay? When that's the case, there's no evidence you then need to further show market demand. Laser dynamics also, as I understand it, I know it's your case. It's not market demand. It's consumer demand. Or that piece that drives the sales of the, rather, it's that patent feature that drives consumer demand. Okay. And my understanding, and you can certainly correct me if I'm wrong, being that it's your case, is that laser dynamics establish that it's entirely appropriate to use the smallest sellable patent-practicing unit. In which case, you don't have to show that demand. You do if you go to the entire market value rule. Because then you have to establish a demand of the patented features for the product, which is now more than what is patented. That's what the court did here. It used the entire market value. No. With all due respect, whether you call it entire market value rule or something else, it did start out with going through its lost profits analysis and called that section entire market value rule. What I'm saying is that, in effect, you can call a rabbit an elephant, but it's still a rabbit. In effect, what was applied here by the experts, by both sides, and by the judge, was a royalty base, which was indeed the smallest sellable patent-practicing unit. So, whether you call it entire market value rule or call it something else, the point is, in fact, it was application of a royalty base, which reflected the smallest sellable patent-practicing unit. In fact, we pulled away everything that was sold separately, even though it was part of the claims. We basically stripped this down to basically the clamping mechanism and the blade. There isn't much more other than the housing. And frankly, the vibration rod, which ends in a blade. You don't sell these separately, and there's good reason. This thing operates at 55,000 kilohertz. You wouldn't sell a blade separately. You wouldn't want pieces. In fact, the blade is part of the vibration rod. You buy it, and you throw it away for good reason. You want to have a unitary structure to perform this function of cutting and coagulating because of this vibration. So, we're down to that. That's why we don't need to show customer demand, but I believe that our demand for the curved blades, etc., is shown at our briefs between 54 and 55, and the demand for the dual cams is shown 55 to 57. I should mention, just to make clear, that our evidence of demand for the dual cams is because, as Dr. Durfee testified, and the court found, and was uncontested, the dual cam is what enabled Epicon to go to a 5-millimeter trocar fitting. And because of that... The district court clearly said that it's not just the cams and the blades that drive consumer demand. There's other features that drive consumer demand as well, and that's what the doctor's statements go to show. Okay. Good observation. The court said that rotation was one of the additional features that drove demand, besides fitting down a 5-millimeter and curved blade, and the court specifically factored out that part of the demand and said, I'm factoring out those features, and I'm left with curved blade, and the power of the dual cams. That's exactly what the court said, in coming to my royalty rate. The 8%? Yes. And the 8%, the percentage of the 8% was taken from what? The 8% is based on all of the Georgia-specific factors, the experts looking at the facts on both sides... What's the base? What's the base? What was it multiplied against? It was multiplied against the average selling price of that unit that I'm talking about, which is the smallest saleable unit. Okay. I think we're going around in circles with regards to smallest saleable unit, but I think you're kind of saying two different things, which I think there's a distinction between you're saying we can rely on the smallest saleable unit. But I think you've acknowledged that you have to still do the apportionment, because even in the smallest saleable unit, there are non-infringing features that have to be accounted for. You can't just say because this is the smallest saleable unit, we can use it in its entirety, and we don't have to account for those other features. Fair enough. Do we agree on what the law is there? I would agree that you cannot get the benefit of the non-patent features if they're separable. There are going to be times when they're not separable. In this case, the court found that, for example, rotation was separable, and it factored out that that is the apportionment. So what was the evidence that you say is in the record with respect to driving demand? So the evidence of driving demand is the myriad of documents produced by Ethicon from their marketing documents saying what the surgeons needed, and that included rotation. The three things that the parties talked about on driving demand were rotation, fitting down a 5 mm tow car, and curb blade. And as I said, Dr. Davison provided unrebutted testimony that the reason you could fit down a 5 mm tow car was enabled by the dual cams. So basically it boiled down to curb blade, dual cams, and rotation. The court specifically took out of that the demand for the rotation and came up with the 8%, and said that that's what it was doing. Did I answer your question? Yes. Thank you. Now we're almost done with time. I know you had reserved some time. You wanted to reserve some time for the cross appeal, but I assume given the lateness of the hour, we can just rest on the briefs on that, unless you want to spend a minute talking about the cross appeal. I would like to spend just a minute on conception, if that's all right. Conception, so the cross appeal goes to the fact that they should not have even been awarded a subsequent reduction of practice. And that's because there was no conception prior to Tycho's conception or reduction of practice. You're talking about really the other cases where she found the other 26 claims or whatever that they dropped on anticipation. Absolutely. So conception, as this court well knows, by definition requires a definite and permanent idea of the complete and operative invention as it's thereafter applied in practice. Specifically, records show that Ethicon's idea of the five millimeter ultrasonic device for cutting and spraggling was in constant flux prior to and beyond Tycho's conception or reduction of practice date. They started with a single tab. They were never able to reduce that to practice, as the court found, to reliably cut and seal blood vessels or apply it in practice as required, ever. Ethicon tried 12, according to the evidence, Ethicon tried 12 blade designs, four pad configurations, five pad materials, and a range of clamp force and amplitude evaluations. 205 attributes were tried. Ethicon's Dr. Gallagher, who was in charge of this testing, admitted it was balancing trial and error. It was basically trial and error. That's what she testified to. In July and August 1997, the project was placed on hold. This is after we conceived and reduced to practice. And indeed, they considered 40 entirely new ideas for the clamping arm and they came up with the dual clamping structure. That had a ripple effect, according to the evidence, a ripple effect through the entire design of the device, implementing other key aspects. So it wasn't until, and they never reduced it to practice. They never came out with, as is required, application in practice. So now you have the idea of the dual cam, which is at a later date. That's what they got to work. That's when they came up with a complete and operative invention, as it's thereafter applied in practice. And that's what they put to practice. Okay, I think I'm going to need to round it out. We've got a long morning here and you've way exceeded your time. Okay, thank you. We'll give you a minute if you need it, if your friend responds to your cross-appeal. Thank you very much. I'll just address the cross-appeal briefly. By November of 1996, we had engineering drawings and actual prototypes of a device that Dr. Amaral showed could cut small vessels. And the claims are not limited to the size of vessels. Did we continue to work on a product that could be commercialized and could be used to cut larger vessels? Yes. And that was achieved by going to a larger blade. But all the elements remained the same. And whether it's one cam or two cams, it's still within the scope of those invalidated claims. They keep talking about the ability of dual cams to fit down a 5mm choke arm. Well, a single cam device could do that. This device can fit down a 5mm. Can I ask you about the motivation to combine on the dual cams? Your friend pointed out that the district, or I think pointed out the district court, even though it rejected relying on the 102G prior art, went ahead and discussed it in the context of the dual cam. And I just looked at the opinion. It looks like on page 62, the court does, 62 and 63, and does reject it as even looking at the Ethicon prototype, finding that there's no motivation to combine. What's your response to that? Well, the court did discuss it in the context of a simultaneous invention, not as prior art. But the motivation is you want a larger blade. Now, the motivation is to simply go to one of a simple mechanical alternative to a single cam is the dual cams. You just move them to the side. Is there art that teaches dual cams? Yes, EP662. Now, what the district court relied upon in finding the dual cams... I guess what I'm having a problem with, I understand, and the court doesn't seem to discuss the EPC prior art here, but... It didn't. It does talk about the prototype, which is what your main assertion of error is, and then says, you know, you argue that it would be obvious in light of the prototypes to switch to a dual cam, and it just says the court disagrees. And if that's a factual finding on motivation to combine, I have a pretty hard vote. Well, here's part of the district court's error. In finding it not obvious, the court said, Well, look, the dual cams achieved something that the single cam somehow couldn't achieve, the ability to fit down a 5mm trocar. One, that's factually wrong, because the single cam device could fit down it. But more importantly, the dual cam claims don't require the ability to fit down a 5mm trocar. It's not an element of the claim. So in your obviousness analysis, you shouldn't look at this ability to fit down a 5mm trocar. That also goes to the damages point. They say, well, it allowed you to fit down a 5mm trocar, and therefore that shows, I don't see how it shows consumer value, but it's not even an element of the claim. And so it's a red herring to start talking about the ability to fit down a 5mm trocar to support a finding of non-obviousness. Does Kimberly-Clark, does it impose a prior reduction to practice requirement for 102G? It does not. The facts of Kimberly-Clark, the argument in Kimberly-Clark made by the person challenging the patent was that we reduced it to practice before the patentee did. That's one path down 102G. They weren't arguing diligence with a latter reduction to practice. I would call the court's attention to the Monsanto case. In the Monsanto case, that it was 102G was proven by the alternative route of earlier conception, diligence, and a later reduction to practice. The district court judge found you didn't prove it the first way with a prior reduction to practice, but the statute expressly provides this alternative path, and the district court found that that's what the jury did, and that was sustained by this court. Kimberly-Clark does not somehow change the clear wording of the statute. The facts of Kimberly-Clark simply, they weren't arguing the alternative path down 102G in that case. Here, we did, and we proved it. Thank you. Since your friend spent about 30 seconds talking about your cross-appeal, we'll give you 30 seconds or a minute to respond. I'll try to engender the appreciation of the court by spending less. I know I'm limited to the cross-appeal, so the only observation I'll make is Mr. Kavanaugh seemed to suggest that the size of the vessel was an issue, that there was appropriate sealing of small vessels, so I just want to say the court specifically concluded in the intended purpose for the prototypes for the reduction of practice analysis is only that the vessels, I'm sorry, the devices were able to effectively cut and coagulate during surgery, and that the details of vessel size are largely irrelevant. The court found it didn't matter. There was no effective sealing, and it was not reduced to practice based on vessel size. Thank you. I thank both counsel. The case is submitted. Thank you.